Leonard A. Peto and Vera Peto v. Commissioner.
Peto v. Commissioner
Docket No. 57440.
United States Tax Court
T.C. Memo 1958-34; 1958 Tax Ct. Memo LEXIS 194; 17 T.C.M. (CCH) 139; T.C.M. (RIA) 58034; February 28, 1958
*194 John Wattawa, Esq., 1317 F Street Northwest, Washington, D.C., for the petitioners. Thomas C. Tyre, Esq., for the respondent. MURDOCK Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency of $15,083.85 in income tax for 1948. The issues for decision are whether the petitioners are entitled to deduct as ordinary and necessary business expense (a) $4,199.60 expended by Leonard in 1948 in an unsuccessful effort to have Montreal install a monorailway system which might lead to employment of Leonard in some capacity, and (b) $29,353.14 expended by Leonard in 1948 in an unsuccessful effort to build a sports arena and establish a major league hockey team in Philadelphia which would provide employment for Leonard as chief executive of the operation. Findings of Fact The petitioners, husband and wife, filed a joint income tax return for 1948 with the collector of internal revenue for the second district of New York. Leonard was an executive of Canadian Car and Foundry Company, Limited, prior to 1945. It built street cars, railroad cars and other transportation vehicles. Frank S. Lyon owned patents and had assembled data relating to a Suspended *195 Monorailway System. He was party of the first part to an agreement dated "October 15, 1946" for the "exploitation" of the system. Several persons became parties of the second part to the agreement, called participants, "BY MAKING SUBSCRIPTIONS FOR THE PURPOSES HEREIN STATED" to the "Development and Exploitation Fund" "in units of $1,000." Lyon was named manager of the fund and, with two others, constituted a "Committee" to use the fund. The participants could vote under specified circumstances. Paragraph Third of the agreement was as follows: "THIRD: It is contemplated that when the further development of details, designs and specifications and the presentation of a comprehensive plan to the City of Mexico and perhaps to other municipalities shall have reached the stage where the Committee shall deem it necessary to enter into contractural relations with one or more municipalities and/or suppliers of equipment, engineers or contractors, a corporation shall be organized, under the laws of such jurisdiction as the Committee shall determine. Lyons agrees to transfer to such corporation the patents relating to the Suspended Monorail System owned by him and all data accumulated by him *196 with respect thereto, at such proper valuation as shall be approved by counsel. The various Participants shall receive a senior security equal in par value to their payments hereunder (pro rata to their subscriptions, so far as may be practicable, but with no fractional shares being issued), and an amount of common stock similarly prorated, not exceeding in the aggregate 40% of the total amount thereof authorized. Sixty per cent of such common stock shall be retained by Lyon and his associates." The arrangement was not to "constitute a partnership." Leonard became a "participant" on March 21, 1947. He subscribed $4,000 for four units in 1947 and paid $2,250 as additional subscriptions during 1948. Most of that money was paid to a firm of engineers. Leonard also expended $1,949.60 during 1948 (some after May 5) in his efforts to have the City of Montreal, Canada, install a suspended monorailway transportation system. His purpose was to gain what advantage he could through his participation and other expenditures in his efforts to have Montreal install a monorailway in the hope that he might then be employed in some capacity in the installation and use of the system. The City of *197 Montreal took no decisive action in 1948 with respect to the subject. Lyon and five others, including Leonard, terminated "The said agreement, dated October 28, 1946" on May 5, 1948. Leonard received no asset as a result of the termination. No part of the $4,199.60 expended by Leonard during 1948 was an ordinary and necessary expense of any business regularly carried on by him during 1948. Leonard was a sports enthusiast and officer of several football groups in Canada. He was a director of Canadian Arena Company prior to 1946. That company owned the franchise of the Montreal Canadiens, a member of the National Hockey League, the six-team major ice hockey league. It also owned the inactive franchise of a former team in the same league, called the Montreal Maroons. Representatives of the league suggested to Leonard that he try to activate the Maroon franchise, and the Canadian Arena Company entered into the following agreement with Leonard on April 18, 1946: "In consideration of the sum of Twenty-five thousand ($25,000.00) dollars, the receipt of which is hereby acknowledged, the Canadian Arena Company hereby sells and transfers to Leonard A. Peto of Philadelphia, Pa. the 'Maroon' *198 franchise in National Hockey League, subject to the approval and confirmation of the said National Hockey League. "In the event of the approval and confirmation of the National Hockey League being withheld or the project of a suitable building in which to operate a hockey club under the said franchise in the National Hockey League not being erected within the period set by the National Hockey League, the said franchise shall revert to the Canadian Arena Company upon the return to Leonard A. Peto of the purchase price." Leonard then endeavored to activate the franchise in Philadelphia. He bought land, had some plans drawn, interested a banking firm to arrange for funds and organized two corporations on June 17, 1946, Penn Center Corporation, hereafter called Penn Center, to own the franchise and the arena, and Maroon Hockey Club, Incorporated, hereafter called Maroon, to operate the team. Leonard was at all times and still is the president and sole stockholder of Penn Center, and Penn Center has been at all times and still is the sole stockholder of Maroon. Leonard has been at all times and still is president of Maroon. Leonard offered, at directors' meeting of Penn Center on *199 April 1, 1947, to transfer to Penn Center as of December 31, 1946, (a) the land on which the arena was to be built and (b) "all of his right, title and interest in and to"the franchise. The land was subject to a $200,000 first mortgage and a $110,000 second mortgage. The cost to Leonard of the land and franchise was stated to be $72,817.35 for the land and $27,181.65 for the franchise. The corporation was to issue some of its stock to Leonard as consideration for the transfer of the land and franchise. The offer as stated was accepted at that meeting and directions were given to carry out the agreement. Leonard stated at that same meeting that he proposed "to place the Company in funds required during the period of organization" by subscribing $20,000 for some of its shares. Leonard desired a "farm" club from which Maroon might obtain players when it was in need of them. Maroon entered into a contract with M. J. Uline Company on June 26, 1947, for this purpose. Maroon therein agreed to finance Uline's operation of its American Hockey League franchise for the season October 1947 to March 1948. All players were to be the property of Maroon. The gate receipts, less expenses during *200 the season, were to go to Maroon. Uline did not make expenses during the season, Maroon's bankers refused to supply additional money needed to keep the team playing during the remainder of the season and Leonard contributed $25,000 of his own money to Penn Center in January 1948 with instructions to use it as needed to keep the Uline team going. Penn Center mingled the $25,000 with its other funds and expended more than $25,000 of its funds during 1948 to keep the Uline team going. All benefits of the Uline contract to Maroon or its parent corporation were lost when the National Hockey League "Maroon" franchise was terminated in June 1948. Leonard encountered difficulties in his unsuccessful efforts to have the arena built within the time allowed him by the league and this led in June 1948 to the revocation of the conditional transfer of the "Maroon" franchise and the return by the Canadian Arena Company to Leonard of the $25,000 purchase money. Leonard, prior to that time, had become obligated to pay player scouts and for travel and paid $4,353.14 in discharge of those obligations during 1948. Maroon is still in existence but inactive. Penn Center is still in existence. Its *201 board of directors ratified and confirmed on May 14, 1956, an agreement of sale dated February 21, 1956, between Penn Center and Joseph B. Simon & Co. for the sale at $400,000 of real estate of Penn Center. Leonard's purpose in trying to activate the "Maroon" franchise, through the formation of Penn Center and Maroon, the contract between Uline and Maroon, the scouting of players and the other activities described herein, was for the purpose of obtaining employment for himself as an executive of Penn Center and Maroon. The Commissioner, in determining the deficiency, disallowed, inter alia: Loss on Monorail Syndicate
$ 8,088.10
Advance to Washington Hockey Club
28,341.40 He explained that these were not allowable as deductions under any of the provisions of the Internal Revenue Code. No part of the $25,000 which Leonard paid to Penn Center in 1948 and which Penn Center used in that year, along with other of its funds, to carry out Maroon's contract with Uline and no part of the additional $4,353.14 which Leonard paid out in 1948, as above described, was an ordinary and necessary expense of any business regularly carried on by Leonard during 1948. All stipulated *202 facts are incorporated herein by this reference. Opinion MURDOCK, Judge: The petitioners make but one contention - that the amounts in controversy were ordinary and necessary expenses of a business carried on by Leonard during 1948 deductible under section 23(a)(1)(A). They strenuously deny the existence of facts which might conceivably lead to a deduction of any other sort. One alleged business they described as "efforts to develop use of the Suspended Monorailway System so that he [Leonard O. Peto] might be gainfully employed in connection with such use", and they say the other expenditures were "for the purpose of helping to bring about operation of a sports arena in Philadelphia by the Penn Center Company, wholly owned by him, thereby aiding to sustain the value of his stockholdings in that Company, and also affording him gainful employment with that Company." They cite no case which supports such contentions, and they ignore cases cited by the Commissioner holding that amounts expended to establish a business or to obtain employment are not ordinary and necessary expenses deductible under section 23(a)(1)(A). , affirming *203 , affirming ; ; ; . The amounts expended directly and through the group in trying to have Montreal install the transportation system apparently brought no compensating benefits to Leonard during 1948 and probably were wasted and, in a sense, lost. However, they were not ordinary and necessary expenses of any business carried on by Leonard during 1948 within the meaning of section 23(a)(1)(A). The petitioners deny that the $2,250 was in any sense a capital contribution and they claim no capital loss on either the monorailway or the hockey activities. Cf. , revd. on other grounds and , affd. . Penn Center lost the money which it paid Uline in 1948. As to its deductibility see , affd. . However, there is a distinction between a corporation and its sole stockholder *204 fatal to the contention of these petitioners in a case like this since expenses of the business of one are not expenses of any business of the other. ; ; ; ; ; . "Payments made by a stockholder of a corporation for the purpose of protecting his interest therein must be regarded as additional cost of his stock and such sums may not be deducted as ordinary and necessary expenses." . Leonard's activities herein described did not result in any earned income, such as salary or wages, and were not for that purpose except ultimately through hoped for contracts of employment at substantial salaries. Cf. . If, as the Commissioner contends, the $25,000 represented a capital contribution by Leonard to Penn Center, there would be no proof of a resulting capital loss to Leonard in 1948, since the corporation continued to exist and to own at least one valuable *205 asset. Leonard was asked whether he expended the $4,353.14 in his own behalf or, as president, on behalf of Penn Center or Maroon. He admitted that "I would be hard put to say which was which in those circumstances * * *" and continued his answer without showing that he was not acting for Maroon. The expenditure of that money was intended to benefit Maroon and Penn Center and a part might have been a capital expenditure for them in obtaining players had Leonard been successful in activating the "Maroon" franchise. It did not represent an ordinary and necessary expense of any business which Leonard personally was carrying on during 1948. Decision will be entered for the respondent.